Clerk, please call the next case. Clause 10, 1784, Alexi Vianna-Noulias v. C.S. Fowler Good morning, and may it please the Court. My name is Cliff Berlow. I'm an Assistant Attorney General, and I'm here on behalf of the Illinois State Treasurer in his role as the Administrator for the Second Injury Fund. This case arises under Section 8E18 of the Workers' Compensation Act. That section provides for permanent disability benefits for individuals that suffer an injury causing them to lose the complete and total use of a limb if they have previously lost the total and permanent use of another limb. This Court's precedent is clear in interpreting this provision. In order to qualify for permanent disability under this section, an individual must establish that they have lost all normal use of both limbs. There is no dispute between the parties that Mr. Thomas has lost the 100 percent use of his left leg. The sole issue before the Court is whether Mr. Thomas has lost 100 percent use of his right leg. And you're saying he's lost 100 percent. He has not lost 100 percent because he still has – he's still employable in some capacity? Is that your argument? With us – I would reword that slightly, Justice Hudson. Mr. Thomas has not lost – Mr. Thomas has not lost 100 percent use of his right leg because Mr. Thomas still has the ability to use his right leg. This case differs from your garden variety workers' compensation case where the focal point is whether or not an individual can continue to work. Well, is really work – is that really the issue? Is it the issue under the case law, counsel, whether or not he is able to – the member, the leg in this case, no longer performs its normal function? The normal use of the member is controlling, isn't it? That's right. Not whether or not he can work in some capacity, not whether or not he can walk at all. Well, the question is – I think the question of work is actually wholly, candidly irrelevant under this provision. The question of work is something that is more appropriately targeted to an 8F inquiry. Right. 8E is fully about normal use. And an individual that can use their right leg to walk has at least some normal use in their leg. 100 percent is a high bar. There's simply no doubt. And an individual that has the ability to use their right leg to walk – So you're saying it should be simple. If somebody can walk, you can't be a firm total. Well, again – It seems to be what you're saying. Yes, that certainly – that certainly is. The only nuance I might add to that would be that there probably are some circumstances in which an individual has such a de minimis ability to walk. It's unpredictable. It's extraordinarily rare. I think there might be a distinction that could be drawn between – there might be a case that that individual has reached some sort of de minimis threshold. Mr. Thomas, however, clearly does not come over that sort of de minimis threshold. What defines the de minimis threshold? Well, I think that the de minimis threshold is exhibited in one or two of these cases. I think the Illinois Bell Telephone case, which Mr. Thomas cites in his brief, appears to recognize that sort of de minimis threshold, where the individual essentially had an unpredictable ability to use his leg in order to walk. That individual's pain was so great that on most days the claimant was unable to walk. And so it's difficult to say that he really has normal use of his leg if he doesn't know when he wakes up in the morning whether he's going to be able to put weight on his leg. But typically – but Mr. Thomas clearly – that's not the case for him. In his own words, a good 20 times per day, Mr. Thomas walks in 10 and 15-minute increments. Now, in the aggregate, that's between 3 and 5 hours in which Mr. – out of an 8-hour workday, in which Mr. Thomas is walking and using his leg to propel himself forward. So he acknowledges that. He also says that when he does walk and he climbs stairs, it's with extreme difficulty. He's got increasing pain. He cannot drive a car without the use of hand pedals. He cannot put on his socks and shoes on his right leg. He cannot perform other functions. Why is it against the manifest weight of the evidence? Obviously, he's not – his leg isn't functioning normally as opposed to you and I are a normal person, is it? Well, I would distinguish between functioning normally and any amount of normal use, which is the standard the Court has laid out. Now, all of those examples that you cited and that Mr. Thomas cited in his brief are, in truth, limitations on his ability to use his leg. But they are not absolute restrictions. The standard here is 100 percent loss of use. That is an absolute restriction standard. It differs from a – from limitations. Well, who makes the determination? Okay. So 100 percent loss of use. Yes. So nothing less than a cutting off the leg. No, I don't think so, Justice Holdrege. I think that there – an individual – the cutting off the leg is obviously quite extreme. Mr. Thomas could say – Well, that would be clear cut. We wouldn't be arguing. No, that's right. And the statute candidly provides for a separate provision for just losing the limb altogether. Right. So I don't think that that's – So you're not going that far. No. If Mr. Thomas needed an assistive device to walk at every moment of every day, this would be a much closer case. But what if the assistive device allows him to walk 7 hours? Well, I think that the question would be if – I think that that's – again, that's a closer question, certainly. We're not conceding one way or the other whether that – whether that qualifies 100 percent loss of use. I think that the – but I think where an individual has the ability to independently use their limb and use it without an assistive device, which Mr. Thomas is able to do by his own admission. He only uses a cane when the weather's bad. Admittedly, this may not be the best climate for that standard, but it certainly is not the case. Well, procedurally, to be candid, you're in a little bit of a difficult position. If the commission had found that the loss was not the loss of normal use and had found against the claimant, you'd be in a better position. Isn't it up to the commission to determine what constitutes the normal use – normal use of the member under the case law? And then you have the hurdle of showing it's against the manifest weight? I mean, there's certainly evidence here to support he's lost the normal use of his leg, isn't there? Isn't there some evidence – you conceded there's some evidence of that? Well, he's lost some normal use, but not all of the normal use. That's a distinction that I would make. Okay, so that's where we're going, is amount. Yes. I think you earlier said amount. What is the analytic framework for determining what's the amount that says there's no – you've lost the normal use versus what you're claiming there is some normal use? Well, I think that the difficulty with this case is that you have two fundamentally irreconcilable findings here. Mr. Thomas can use his leg consistently on a regular basis, albeit with limitations, to walk. And Mr. Thomas can't use his leg at all. Those two things are simply so fundamentally incompatible that the Court, I think, here has an obligation to explain how the ultimate finding, which is that 100 percent he cannot use his leg, is able to be – follows directly from these examples in which Mr. Thomas, in fact, can use his leg. I think the clarity of the – under the manifest way of the evidence standard, I think the clarity of the Court's ultimate decision here follows directly from the fact that those two findings are simply irreconcilable. I think if the Court examines its own decision here in ARA services where the Court held – where this panel, in fact, held that an individual has the ability to ambulate, the ability to walk and to stand, even if those abilities are limited in some way, in that case the individual could only walk for approximately two – between two and three hours. In Mr. Thomas' case, it's between three and five hours a day. I understand your point. There's some intuitive appeal.  You throw that out of your analysis. Isn't that part of it? Don't the cases talk about normal use? It's not one extreme or the other, is it? According to you, you can see if his leg was cut off, he lost the normal use. But now you seem to be saying because he can walk somewhat, a little bit, do some normal functions of life, he can't be a prim total. That's what you're saying. Well, I think the standard – well, the statutory language here is total loss. So I think the notion that you have to be able to use your leg exactly as you could before in some capacity and then the other limitations are collateral in order to meet the 100 percent threshold essentially flips the analysis on its head. The – this is a unique provision. It is a narrow provision. And so for the court to essentially say that so long as you could walk in exactly the only circumstance in which an individual doesn't qualify for permanent disability benefits. Our view is precisely the opposite and is more consistent with a long line of case law dating back to the 1950s, this Court's precedent at least dating back to the 1980s that I've examined, where it is made very clear that the threshold is – the standard is that someone – that a claimant has to demonstrate that he has lost all use, all normal use in order to qualify for permanent disability. Well, that's – you just said normal use. Yes. And Mr. Thomas has some normal use. He doesn't have all of his normal use. He has the ability to ambulate. That's the standard that this Court established in ARA services. Mr. Thomas is – this Commission decision is completely in conflict with ARA services. There's simply no way around that. And it – and it simply defies a reasonable explanation for how the Commission could look past that case. And tellingly, Mr. Thomas made no effort to distinguish that case in his brief. So – So you're saying the – to simplify it, as long as the claimant can ambulate, they cannot be found as a matter of law to have 100 percent loss of use. Yes. Yes. And I think that is – that is the generally applicable standard, with the sole exception for that de minimis circumstance, which I don't think applies here. Because if Mr. Thomas qualifies under the de minimis standard, then almost anyone who has some limitation would have a credible de minimis argument under the statute. And again, give me an example of de minimis. A de minimis standard would be an individual, for instance, who had no flexion in his leg, because he was a walker at all times. That individual would not have any meaningful amount of their ability to use their leg because they're dependent on some other device or object. Where did the notion of normal use come from? Well, I think the court – I think it originated in a 1953 case from the Illinois Supreme Court. It didn't originate in the statute, because that's not what the statute says. No. It's an interpretation from the Illinois Supreme Court. The statute says permanent and complete loss of use of. Yes. Permanent and complete loss of use of, which leads to the argument that if he has any use at all, he doesn't qualify. Yes. Yes. Normal seems to be something that's judicially unacceptable. It is an interpretation of the provision. I think a plain text reading would say complete means exactly that, complete, 100 percent. And you're saying that first came in. I believe it's the Arnett opinion. The case that Freeman United Coal Mining is the one that I would call the Court's attention to, which I don't recall if we cited in our brief or not, but I know it's cited in the ARA services case as the – as in explaining what the statute provides for. Which case is it cited in? It's in the ARA services case it was cited in. And our view is the case in the 50s, 415 Illinois 5.2. Okay. The standard is not whether someone can ambulate. Well, the standard – I mean, that's a judicially imposed interpretation with respect to a leg. Certainly an arm, that wouldn't be relevant. Well, there are people who suffer the amputation of both legs below the knee who get fitted with prostheses who can run. Well, but the statute does carve out a different standard in the case of amputation and the loss of a limb. So I think that that's – we're somewhat in a parallel analysis there, where the individual still has the limb, then the ability to use the limb to ambulate independently at the – certainly, if they have the independent ability to ambulate on that limb. Counsel, on page 12 of your brief, you just indicated that if you can ambulate at all, you shouldn't be a permanent and total disability because you're still moving. On page 12 of your brief, you say, and I quote, To satisfy the burden, the employee must establish that he or she has lost 100 percent use of the normal function. Yes. 100 percent use of the normal function. So it's not 100 percent use of the limb of the normal function. So normal function is in the mix, is it not? Well, yes, it is. And one of the normal functions of a leg is to walk. So unless a claimant can demonstrate that they have lost the 100 percent ability to walk on that limb, they don't qualify under the statute. Did you say 100 percent walk normally? Well, I – See what I'm saying? I mean, the normal use is still a factor to be interpreted. Well, the normal use is to walk. And the question is whether or not the individual has lost all of that normal use, not some of it. Counsel, your time is up. You have time on rebuttal. Thank you. May it please the Court? Counsel. My name is Frank Gaughan. It's my pleasure to represent Mr. Thomas in this case. Mr. Thomas is able to walk, correct? He can walk. But the question, I think, is why can he walk? He's got an artificial hip. He's got an artificial knee. He's got – those are assistive devices. They're artificial devices that give him the mobility, the flexion in his knee so he can walk. They give him the flexion in his hip that he can walk. Without those, he'd probably have to have a brace in order to ambulate at all. He has severe restrictions. He can't – he's unsteady on his feet. He can't lift more than 15 pounds. And if you read the FCE closely, it says he cannot do that safely because he can't bend from the weight and he can't bend or flex. And he's not steady when he's lifting. It talks about lifting from a table. If he's sitting, he can lift the 15 pounds safely but not standing. What about his argument, which is a simplified argument, that your client can ambulate, he can walk, albeit with assistance, therefore he hasn't lost 100 percent use of his limb? Well, I think if you look at the Illinois bell case, that man could still walk. If you look at the state treasurer versus Alvey Kemp, which was cited in both our briefs as well, that man could still walk as well. And Alvey Kemp, he had polio in the left leg and I think he had arthritis in the right knee. So it's very similar to our case, except my man's injuries were much more severe. He ended up with a total hip replacement, a total knee replacement, as well as the fractures in the tibia and fibula that had to be surgically repaired as a result of this accident. This man was very active prior to this accident. He played softball with the artificial, he had the below-the-knee amputation in the left knee. He was able to play softball because he had an artificial limb. He can't do any of this anymore because of the right leg. He has to walk one step at a time, plant both feet on the step. He takes out the garbage, he has to throw it over because he can't carry it down. Then he has to go down the steps. To walk, if you look at the FCE, .11 miles, it took him almost five minutes to walk that. That's pretty slow. So he's not steady on his feet, he's very slow. Yes, he has a sedentary job. That's something the commission looked at. He does have to walk around occasionally, but he complained that he had some pain when he does that. The commission also looked at his age, loss of income, the change of jobs, the lack of mobility, the pain, the artificial devices. He has to occasionally use the cane. He has to use artificial devices to assist him getting dressed, take a shower, use his hand controls to drive his car, because he has a loss of sensation in that right foot. These are all things that go to show that the commission's decision was not against the manifest weight of the evidence, that they had enough information to base their decision on to find this man at 100% loss of use of his right leg, and because he had the prior amputation on the left leg, he was entitled to the statutory permanent total disability benefits, even though he was able to work. And I think that the commission's decision is certainly consistent with this court's decision in State Treasurer v. Alvey Kemp, as well as the Illinois Bell case that was also cited in my brief. And I ask you to affirm the commission in all aspects. Thank you. Thank you very much. Revenue. Briefly, counsel for Mr. Thomas perpetuates what I think is the central error in his analysis, is he treats what are limitations on normal use as absolute restrictions. And that simply is inconsistent with the standard that the court has laid out. He seems to want to and now create what amounts to an artificial device exception, which essentially forced, which because Mr. Thomas has had a hip replacement and a knee replacement, he is therefore entitled to permanent benefits because absent modern medicine, he would not be able to do those things. We are not bound to apply a standard rooted in pre-20th century medicine. Well, earlier in your de minimis, you gave an example of braces, that that might be. And if those are no longer necessary, Justice Holdred, because of modern medicine, I would think that it would be reasonable for the court to say that we are not in a world where we would be engaged in what if an individual was required to use medicine that no longer exists. Well, I guess the question is what is the real difference between now we don't have to have braces because we have artificial hips and artificial knees? Is there really a difference? Because you were going to give for braces, okay, that's in that de minimis group I think earlier. Well, I think that because he has volitional control over his leg, that's different than someone who has to have a separate device that is, and this gets into surgical insertion and external physical component, and that's why I think I said it was certainly a closer question. In terms of Mr. Thomas's reliance on the Bell Telephone and the Treasurer case, I would just briefly remind the Court, in the Bell Telephone case, that individual did not know when he woke up in the morning whether or not he would be able to use his legs. Mr. Thomas is able to walk routinely and does so between three and five hours every day as part of his job. And with respect to the Treasurer case, that individual had polio and had no flexion whatsoever in his right heel, and the argument was that he had lost 100 percent use of his right foot. An individual who cannot move their ankle or their heel does not have any use of their foot. So the fact that he was able to move his leg to allow him to propel forward without using his foot doesn't demonstrate that he had any use of his foot. And Mr. Thomas's counsel continues to perpetuate one of the central errors in this sort of analysis, which is to make reference to his pre-injury conduct and say, because he can't do what he did before, he is permanently disabled. And I think that that's not the test, clearly. No, I think that's certainly not the test. I don't think anybody's arguing that's the test. If you look at the Commission's decision, at its core, the central error here is that the Court said its rationale for awarding permanent benefits was that Mr. Thomas would be unemployable if he were to lose his job with the city. That is simply not the standard. So after running through a list of limitations, the next paragraph, the first line, the Commission said, and he wouldn't be employable. That is quintessential paradigmatic 8F analysis in an 8E18 case. And it has no place here. So we would urge the Court to adhere to its precedent, adhere to the precedent of the Illinois Supreme Court, and adhere to the plain text of the statute, and remand this case for further proceedings in the Commission. Thank you, Counsel. Thank you, Justice McConnell. I have trouble reading names. What is your name, please? Clifford Burlow, Your Honor. Clifford what? Burlow, B-E-R-L-O-W. Mr. Bave, who had briefed this case, is no longer with our office. And your name was? My name is Frank Warner, Your Honor. Thank you, Counsel. The Court will take the matter under review for this case. We'll stand at recess for a short period.